UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO. 24-00065-CR-MMH

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

TIMOTHY BURCH MORRIS,

    Defendant,

-----------------------------------------/

**DEFENDANT'S SENTENCING MEMORANDUM
AND
REQUEST FOR DOWNWARD VARIANCE**

COMES NOW, the defendant, TIMOTHY BURCH MORRIS, by and through his undersigned counsel, files this, his Sentencing Memorandum, and Requests a downward variance from the advisory U.S. Sentencing Guideline range, and as grounds therefore, states as follows:

I. INTRODUCTION:

Pursuant to *U.S. v. Booker*, 543 U.S. 220 (2005), the federal sentencing process has adopted a three step approach. (See Fed. R. Crim. P. 11(M), amended December 1, 2007, *U.S. v. Pugh,* 515 F. 3d 1179 (11th Cir. 2008), and Amendment 741 of the Sentencing Guidelines, effective November 1, 2010.) First, the Court is to resolve any disputed guideline issues and determine the advisory guideline range. To that end, Mr.

1

Morris does not object to the calculation of the advisory guidelines found at Paragraph 73 of the Final PSI. Specifically, as to the term of imprisonment, the advisory range is 78-97 months based upon a Total Offense Level of 28 with a criminal history category of I. Although the PSR fails to identify any factors that may warrant a downward departure, and defense believes such factors exist, Mr. Morris will ask this Court to consider them in this incorporated Motion for Downward Variance, predicated under sentencing factors set forth in 18 USC § 3553, in determining a reasonable but not greater than necessary sentence in his case.  Lastly, the Court is to consider all of the sentencing factors of 18 USC § 3553(a) and impose a sentence which is "reasonable" and not greater than necessary to achieve the sentencing objectives set forth in 18 USC § 3553(a). Defense believes there are factors for this Court to consider a sentence below the advisory guideline range, but consistent with the existing statutory sentencing requirements.

## II. SENTENCING MEMORANDUM:

As this Court is aware, district courts are now free from the mandatory nature of the Federal Sentencing Guidelines. Timothy Morris, who has never before been convicted of an offense, let alone incarcerated, appears before this Court for sentencing after having pled guilty to Distribution of visual depictions of minors engaging in sexually explicit conduct, in violation of 18 USC § 2252(a)(2) and (b)(1). Mr. Morris will ask this Court to consider the sentencing factors of 18 USC § 3553 in fashioning a reasonable, but not greater than necessary sentence. With that said, Mr. Morris will ask this Court to accept that a five-year period of incarceration, dictated by the statute as a mandatory minimum, is the appropriate sentence in this matter, thereby representing a modest 18 month variance from the low-end of the sentencing guidelines..

In United States v. Mariano Franchy, case No. 13-60095-CR-ROSENBAUM, defendant Franchy pled guilty to one count of distributing child pornography, in violation of 18 USC § 2252(a)(2). The PSR applied § 2G2.2 and suggested a total offense level 34 and an advisory guideline range of 151 to 188 months. The terms of the written plea agreement called for the parties to jointly recommend a five (5) year term of incarceration followed by fifteen (15) years supervised release. The Court imposed a sentence consistent with the agreement.

In the matter of United States v. Thomas Dean, case No: 17-80230-CR-MARRAH, defendant pled guilty to Possession of Child Pornography, in violation of 18 U.S.C. Sec. 2252(a)(4)(B). The PSR found him to be responsible for 4669 images, along with multiple video files. His total offense level was 30, criminal history category of I. His guideline range was 97 to 121 months. The Court sentenced him to 24 months, followed by 10 years of supervised release.

Notwithstanding the above, "the court shall impose a sentence sufficient, but not greater than necessary," to comply with the purposes of 18 USC § 3553(a). As this Court is aware, district courts are now free from the mandatory nature of the Federal Sentencing Guidelines. *U.S. v. Booker,* 543 U.S. 220 (2005); *Spears v. United States,* 129 S. Ct. 840 (2009); See also *United States v. Ranum*, 353 F. Supp. 2nd 984 (E.D. Wis. 2005) (Adelman, J.) (holding that "Booker was not an invitation to do business as usual.") The Supreme Court's latest decisions emphasize that district courts have wide discretion to fashion an appropriate sentence and that courts of appeals will not disturb those sentences absent an abuse of discretion. Kimbrough v. United States, 522 U.S. 85

(2007) (holding that the Sentencing Guidelines are merely advisory in every respect; judges are free to disagree with them and sentence individuals reasonably), and United States v. Gall, 128 S. Ct. 586 (2007) (departing from 360 months to 60 months (84.5% downward variance) considering the defendant's personal history and characteristics, finding that a "one-size-fits-all" approach to sentencing is not appropriate in securities fraud case.)

**Recent Trends in Child Pornography Cases**:

The PSR in this case recommends a total offense level 28 and an advisory guideline sentence of 78-97 months. A number of Federal judges have testified in front of the U.S. Sentencing Commission that the child pornography guidelines are flawed because they did not result from painstaking empirical study and analysis, which was the Commission's mandate at its conception, but on legislative politics. See, e.g., ABA Journal June 1, 2009. Over the past decade, Congress has repeatedly amended the child pornography guidelines without benefit of any scientific study on the part of the Sentencing Commission. "These guidelines are flawed not only because they are duplicative and draconian but most critically because they apply to almost all offenders, allowing no distinction between aggravate and less aggravated behavior." Testimony of USDJ Joan Gottschall, before the Sentencing Commission. To that same end, many sentencing decisions of numerous district court judges and appellate court panels have established the precedent that the advisory guidelines completely fail to provide an accurate measure of culpability. These cases include, but are not limited to the following: U.S. v. Baird, 580 F. Supp 2d 889 (D. Neb. 2008) 41-51 guideline range, sentence of probation; U.S. v. Cruikshank, 2009 WL 3673096 (S.D. W. VA) 57-71 months, sentence

4

of 36 months; *U.S. v. Duhon*, 541 F. 3d 391 (5t Cir. 2008), 27-33 months guidelines, sentence of probation; *U.S. v. Huchkins*, 529 F. 3d 1313 (8th Cir. 2008), 78-97 months guidelines, sentence of 18 months; *U.S. v. Phinney*, 599 F. Supp. 2nd 1037 (E. D. Wis. 2009), 37-46 months guidelines, sentence of 6 months; *U.S. v. Polito*, (unpub.) 2007 Westlaw 313463 (5th Cir. 2007), 27-33 months guidelines, sentence of probation; *U.S.v. Prisel*, (unpub) 2008 Westlaw 4899451 (6th Cir. 2008), 27-33 months guidelines, sentence of one day; *U.S. v. Rausch*, 570 F. Supp. 2d 1295 (D.Colo. 2008), 97-120 months guidelines, one day sentence, *U.S. v. Rowan,* 530 F. 3d 379 (5th Cir. 2008), 46-57 months guidelines, sentence of probation; *U.S. v. Stall*, 581 F. 3d 276 (6th Cir. 2009), 57-71 months guidelines, one day sentence; *U.S. v. Stern*, 590 F. Supp. 2nd 945 (N.D. Ohio 2008), 46-57 months guidelines, sentence of 12 months.

In *U.S. v. Autery*, 555 F. 3d 864 (9th Cir. 2009), the 9th Circuit Court upheld as reasonable a sentence of five years probation for a defendant who pled guilty to possession of child pornography and whose guideline range was 41 to 51 months. In arriving at its probationary sentence, the Autery court noted that the defendant did not fit the "profile of a pedophile" Id. at 2205, had redeeming personal characteristics, no sociopathic or criminal tendencies and was motivated and intelligent. Id. The court further found that "incarceration would undermine Autrey's rehabilitation." Id at 2209 and instead determined that outpatient psychological treatment, sex offender registration and specific conditions which limited his access to minors and the internet, together with a lengthy period of supervision by the U.S. Probation Office, constituted a reasonable sentence reflecting the seriousness of the offense and ensuring just punishment, deterrence and ample protection to the public. This precedent, although only advisory,

5

since it originates outside of the 11th Circuit, is remarkably similar to that of Mr. Morris. Mr. Morris graduated with an Associate of Arts degree and a Bachelor of Arts degree in automotive marketing and business administration, respectively, from Northwood University, West Palm Beach, Florida. Mr. Morris' work history is impeccable, and is reflective of having been employed in varying high-level consultant positions, in addition to a position in the insurance and financial planning field. Most recently, at the time of his arrest, he had been working with Cox Enterprises Group for almost 13 years, in varying positions, including, inter alia, Regional Sales Manager and National Sales Manager. In all of these positions, Mr. Morris was always compensated with a six-figure salary, representing that he was a highly productive member of society.

     Other courts have similarly varied from Guideline penalties because of exceptional circumstances in child pornography cases. See *United States v. Huckins*, 529 F.3d 1312 (10th Cir. 2008) (affirming an 18-month prison sentence where the Guideline range was 78-97 months because the twenty-year-old defendant "did not fit the characteristics of the typical defendant who possesses child pornography," "immediately sought psychotherapy," and "made efforts to correct his life." Mr. Morris' behavior in the instant offense mirrors these factors found to justify a considerable variance in the *Huckins* case, supra. In a post-arrest statement made on-scene after Morris' arrest he stated to law enforcement officers: that he had deleted Kik from his phone and added, "I realized that I was having conversations that were not indicative of the kind of ... man that I am." Later in the interview he reiterated that he deleted Kik because he started having conversations that he should not be having and joining online groups of which he should not be part. [PSI, Paragraph 18]. The time of the last communication with the UC was

6

November 27, 2024. Morris' self-awareness that his behavior was inappropriate, criminal and obscene was the reason he deleted the app. There is no reason for the Government to argue that Morris was simply going into hiding since there was nothing that would explain him deleting the app other than for the reasons he espoused to agents. Morris was arrested on April 1, 2024, five months after the last contact with the UC. Morris has continued in psycho-sexual treatment with Dr. Lori Butts. J.D., Ph.D at the Clinical & Forensic Institute in Ft. Lauderdale since his release from jail, following his arrest.

**Are the Guidelines Entitled to Deference as to Mr. Morris**

Former Chief Judge for the Southern District of Florida, Judge James Lawrence King tackled the issue of when it is inappropriate to give deference to the U.S. Sentencing Guidelines in the case of *U.S. v. Riley*, 655 F. Supp. 2d 1298 (So.Dist Fla. J. King 2009). The court pointed out that although advisory, the Sentencing Guidelines are typically afforded a measure of deference. Section 2G2.2 has, however, been the subject of recent judicial criticism which weighs against imposing a sentencing within the Guideline recommendation. Judge Lynn Adelman, in United States v. Hanson, 561 F. Supp. 2d 1004, 1010-11 (E.D. Wis. 2008), has appropriately summarized the flaws in this section of the Guidelines, which the Southern District Court jurist reproduced in its opinion:

"In a recent paper published on Professor Douglas Berman's sentencing website, an Asst. Federal Defender traced the history of this guideline and pointed out its serious flaws, which were clearly evident in this case. See, Troy Sabenow, "Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography

7

Guidelines", available at http://sentencing.typepad.com (June 10, 2008). As Stabenow explains, much like the crack guideline criticized by the Supreme Court in *Kimbrough,* guideline 2G2.2 is not representative of the Commission's typical role or of empirical study. The guideline has been steadily increased despite evidence and recommendations by the Commission to the contrary. Congress has repeatedly amended it directly, ostensibly to target mass producers of child pornography and/or repeat abusers of children, a class of offenders that make up less than 5% of those affected by the changes. The most recent changes from 2003 apparently came from two lawyers in the Justice Department who persuaded a novice Congressman to add them to the popular Amber Alert bill. Id. at 27. To the extent that the advisory guidelines deserve continued respect from courts, that respect will be greatest where the Commission has satisfied its institutional role of relying on evidence and study to develop sound sentencing practices. This guideline simply does not represent that role, as the Commission itself has acknowledged.

Between 1994 and 2007, the mean sentence in child pornography cases **increased from 36 months to 110 months.** Id. at 1 (emphasis added). As Stabenow notes, this increase was not the result of the empirical approach often used by the Commission, designed to be an expert body on sentencing. Rather, it was the result of arbitrary increases by Congress slipped into other bills, often with little or no debate, resulting in direct amendments to the guidelines. Id. at 2. These amendments destroyed some of the careful distinctions the Commission had drawn between true peddlers of child pornography and more simple possessors or transporters. To its credit, and as in the crack cocaine context, the Commission sought to persuade Congress not make

8

such changes, but to no avail. Id. at 3-7 (quoting letter from Chair of the Commission). Specifically, the Commission has noted that the enhancement for use of a computer does not make much sense because online pornography comes from the same pool of images found in specialty magazines or adult bookstores. Further, to the extent that use of a computer may aggravate an offense, it does not do so in every case. For example, someone who emails images to another (like the instant defendant) is not as culpable as someone who sets up a website to distribute child pornography to a large number of subscribers. If the defendant did not use the computer to widely disseminate the images, use them to entice a child, or show them to a child, the purpose for the enhancement is not served. Id. at 14-15. Yet it applies in virtually all cases.

The Commission, itself, sought to increase penalties for those offenders who also had a history of sexually exploiting or abusing minors, and posed a greater risk of recidivism, certainly a valid concern. However, Stabenow notes that it did so based on a study of offenders in 1994 and 1995, while most offenders prosecuted in federal court today, such as defendant Morris, have no such histories. The typical child pornography defendant today has no prior felonies of any kind, let alone prior abuse of children, and is not involved in production. Id. at 13.

Finally, in 2003, as part of the Feeney Amendment to the PROTECT Act, Congress added the 5- level enhancement for number of images. No research, study or rationale was provided for this huge increase. At the same time, Congress established the 5-year mandatory minimum applicable in this case, as a result of which the Commission also increased the base offense level to 22 to keep pace. Again, this had nothing to do with the Commission's statutory mission of satisfying the purposes of

9

sentencing. Id. at 18-19." Riley @1301-1302

The results are illogical and create an unreasonable advisory sentence. Congress set the statutory range for first time distributors between five to twenty years. Congress could not have intended for the average first-time offender with no prior criminal history to receive a sentence of 78 to 97 months. Mr. Morris distributed two videos, one lasting 24 seconds and one lasting 13 seconds. After a complete examination by the Government's expert as well as defense's expert, both of whom used the latest in Cellebrite technology, no additional child pornography was found on the i-phone of Mr. Morris. The significance of both of these facts scintillate down the need for a downward variance for Timothy Morris. The U.S. Sentencing Commission's June 2021 report found that: "The maximum number of images for possession and distribution offenders **numbered in the millions** [emphasis added], exemplifying how technology has facilitated the ability to acquire and send enormous quantities of child pornography. Although all three types of offenders had large quantities of images, there was some difference between the offenders that generally appeared to reflect the seriousness of their offenses as measured by §2G2.2. Distribution offenders had the highest median number of images (6,300 images), followed by receipt (4,674 images) and possession offenders (2,350) images." Id. @ 30. Morris had two videos, 24 seconds and 13 seconds, respectively.[1]

See also, U.S. Sent G Comm., Results of Survey of U.S. District Court Judges, Jan. 2010 through Mar. 2010, Question 8 (June 2010) (70% of District Judges believe guideline range for child pornography possession is too high and 69% of District judges

---

[1] Guidelines require any video, however short, to be held equivalent to 75 images.

10

believe the guideline range for child pornography receipt is too high).[2] To that end, Timothy Morris offers the following.

    a. **Nature and Circumstances of the Offense**: Mr. Morris' "crime is serious. Punishment is required. Defendant's guilty plea will result in the stain of a federal felony conviction for a sex-related crime as well as extensive restrictions affecting where he can live and work, and how he will be controlled, will follow him for many years." *United States v. D.M.*, 2013 U.S. Dist. LEXIS 63560, at 3 (E.D.N.Y., May 3, 2013).

    The criminal conduct at issue appears to be isolated, non-recurring conduct and lasted a total of seven calendar days. The UC first initiated contact with Morris on November 20, 2023. Thereafter there were intermittent contacts as reflected in Paragraphs 10 through 15 of the PSIR. Many of the defendant's comments were heinous, but the fact remains that the Government found no forensic evidence to either suggest continuing file-sharing of CP with other third-parties, storage, or receipt of CSAM images before the charged conduct or after its occurrence in later November 2023. As indicated above, the sheer lack of such images and lack of consequent behavior to amass or distribute child pornography demonstrates conduct that was limited to what Morris had engaged in with the UC.

    Morris was arrested 5 months after the last communication with the UC. Post-arrest, and after being shown a photo of Kik profile for user "timkw37138," he stated that he had deleted Kik from his phone and added, "I realized that I was having conversations that were not indicative of the kind of ... man that I am." Later, he again reiterated that he deleted Kik because he started having

11

conversations that he should not be having and joining online groups of which he should not be part. (PSI, Paragraph 18). Most importantly, his actions in separating himself from prior criminal conduct occurred before law enforcement made any contact with him. His efforts to distance himself from what Tim knew were prurient and aberrant behavior should be looked at favorably by this Court when deciding whether a sentence of the minimum mandatory period of incarceration (60 months) is not greater than necessary to promote respect for the law and to protect society. That is the position espoused in this, Defendant's request for a 18-month variance downward. Tim's self-awareness of what he had done before law enforcement had tracked him down was eclipsed by his remorse after he was confronted with his actions. He told the U.S. Probation during his PSIR interview: "I am incredibly remorseful. I've apologized to the agents, my family, and my attorney. I should never have been distributing those images." Parenthetically, the undersigned had witnessed Tim apologize to AUSA Brown for his conduct resulting in AUSA Brown having to watch the CP he had distributed.

    Despite Mr. Morris' instant offense, no evidence was obtained by federal law enforcement demonstrating any of the trappings suggesting that Tim was a pedophile. There was no evidence of him being a hands-on offender nor conduct demonstrating high-risk behavior consistent with "a pedophile profile" as discussed in the Autery case, supra. His family's letters speak to a close, but normal relationship with his nieces/nephews, with no concerns expressed, even though now knowing the charges that Tim was facing.

**Tim Morris' Efforts to assist the identifiable victims:**

12

Tim will assure a full payment of restitution to any victims identified in this matter in a genuine attempt of atoning for his conduct and in hopes of trying to make a difference for those victims presented to the defense. The funds are presently available and liquid, and the undersigned is prepared to assist in issuing drafts to the victims as directed by U.S. Probation.

**B. Tim Morris' Personal History and Characteristics**

Tim Morris has submitted at least 19 letters in support of his sentencing. At least ten family and friends are planning on attending his sentencing on January 27, 2025, many of which are traveling great distances in support of him. A resounding message from the letters is that Tim comes from a close, large, Irish-Catholic family. He describes his formative years as almost idyllic. Almost without exception, each of his family and friend's letters speak to a rarely encountered dedication to support him once he is released from prison – rarely encountered because offenses against children often result in the excommunication by family and friends for similarly situated defendants. Each uses the same words to describe Tim. He is loving, loyal, caring and supportive of others. These people that he has touched throughout his lifetime, are now reversing that trend; they are fully in support of Tim.

None bear that dedication to Tim more than his wife, Brigitte. They have been married for 11 years. Brigette was present in the U.S. District Court in and for the Southern District of Florida for the defendant's pretrial detention hearing before Magistrate Reinhart. They heard all of the facts of the case, and other prurient details set

13

out in Special Agent Goodman's proffer of evidence and thereafter on cross examination. It was not easy to hear for her or Tim's sister or Mother. Nevertheless their tireless devotion to Tim and their letters bespeak a devotion. It is not a blind devotion but one based upon knowing that Tim's mistake, although enormous, does not define the man who they otherwise know.

A number of Tim's aunts and his father chronicle the arduous journey that Tim set out on shortly after his arrest. He set about drafting a letter to all of his family and friends in which he took responsibility, without minimizing his own conduct. His aunt, Mary Hyde explained the gravity of Tim taking this step. She correctly states that "Tim informed all of his family to avoid his parents embarrassment and shame of having to do so." Past experience has shown something different in the experience of the undersigned. Many clients inform one or two family members and carelessly avoid taking responsibility, thereby using avoidance to escape additional embarrassment and shame. That same aunt remembers in follow up conversations with Tim his tearful entreaty to "remember what kind of person I have been!" And finally Ms. Hyde talks of Tim's remorse, stating "Tim understands what he did is not only illegal, but morally wrong and harmful to children."

Another letter from his Aunt Madaline Howes speaks of Tim's focus on the "wellbeing of his loved ones. He has told me he accepts his punishment, knows his crime is heinous and has expressed deep sorrow, regret and shame." When pressed, she related that Tim's mind is forever tortured by the idea of his wife being alone and having to press forward because of his careless actions. She also has discussed her

own knowledge of what is systematically understood to be the family demon–alcoholism, as this is this extended family's cross-to-bear. Tim has acknowledged that this disease has been his constant companion throughout most of his life. Other letters refer to this as a family illness that many struggle to control. The PSIR refers to the level to which Tim's alcoholism impacted him. He told Officer Anderson that he was a functioning alcoholic. In spite of that, he commanded positions at work that were rewarded by responsibility and by 6-figure salaries. His wife, Brigette goes further relating to U.S. Probation: "Brigitte, a sexual abuse survivor, spoke confidently about her belief that Morris is not an individual who would sexually abuse others. She opined that Morris' involvement in the instant offense resulted from untreated depression, anxiety, and alcoholism." (PSI paragraph 51).

Tim has accepted responsibility in a truly courageous way. The letter sent to his family and friends was described by his aunt, Ms. Howes, when she stated: "The written letter took courage and demonstrated respect for his family. It completely stripped his soul to the bone, and was written knowing people closest to him would judge him in a negative way."

**Tim Morris looks to help others and elevate those around him**.

The letters submitted to the Court and the allocution that will be put forward at the time of sentencing speak of an individual that helps others and elevates those around him. Judith A. Owens is an 81-year old woman who has known Tim's family for 50 years. She relates the story of her wife's heart attack. She was unable to accompany her to Mt.

15

Sinai in Miami, having to drive instead. When she arrived, TIm and his wife were there. Her anecdote was punctuated by her statement in her letter: "His [Tim's] words really helped this old lady. Notable also is the letter written by Kristina Pistorious, a former junior colleague of TIm's at Cox. Although she is employed in a largely male-dominated sector, she spoke of Tim fostering an environment of respect. He mentored her. She characterized this in the following manner: "His patience, encouragement and genuine investment in my growth made all the difference and I owe much of my professional confidence to his guidance." Later, in her letter she talks about Tim's love for people. She states: "Beyond his professional demeanor, Tim's kindness and empathy left a deep impression on me. I've seen him moved by other's hardships, responding with an authenticity that is rare."

**Conclusion:** Timothy Morris is keenly aware that in fashioning a "reasonable" but not greater than necessary sentence in his case, this Court must consider the nature and circumstances of the offense, 18 USC § 3553(a)(1). To that end, Mr. Morris has accepted responsibility, he remains profoundly remorseful and has done everything he can do to submit to rigorous treatment. He has also assured a full payment of restitution to the victims identified in this matter in a genuine attempt at atoning for his conduct and in hopes of trying to make a difference for those victims presented to the defense.

    Mr. Morris is asking this Court to find that a variance to 60 months is sufficient but not greater than necessary to encompass a reasonable sentence, considering all 18 U.S.C. Sec. 3553A factors.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent by CM/ECF this 20th day of January, 2025 to all parties of record.

HOWARD J SCHUMACHER, P.A.

<u>/S/ Howard J. Schumacher, Esq.</u>

Howard J. Schumacher, Esq.

1 E. Broward Blvd.

Suite 700

Ft. Lauderdale, FL 33301
(954) 356-0477
 FL Bar No: 776335